Mary Malady v. William Malady and Mary B. Caldwell.

No. 2813.

## MARY MALADY v. WILLIAM MALADY AND MARY B. CALDWELL.

The circumstance that a woman is the concubine of her male partner, does not deprive her of an action for the settlement of affairs and a participation in profits derived from capital and labor which she contributed, though much of the property claimed is real estate standing in the copartner's name alone, and had never stood in her's.

If this is good law in favor of the concubine, it is certainly good law against her, particularly when it is invoked to undo a fraud, vindicate the rights of a lawful wife, and enforce laws made to protect the marriage tie and public morals.

The fact of the social relations which Mary B. Caldwell, one of the defendants in this case, has chosen to assume, can not deprive her of what justly belongs to her. She should be allowed to place her capital and industry against the capital and industry of William Malady, her paramour and copartner, and the property purchased during the time they have been living and working together, should be declared property in which they have a joint interest; one half of it should be decreed to be the property of William Malady, and said half to belong to the community which existed between himself and his lawful wife, Mary Malady.

APPEAL from the Seventh District Court, parish of Orleans. *Collens, J. Rogers & Blane,* for plaintiff and appellee. *Race, Foster & Merrick,* for defendants and appellants.

MORGAN, J. Plaintiff institutes this suit to obtain a separation from bed and board from her husband, and for a settlement of the community which existed between them; and she brings Mary B. Caldwell in the litigation in order to claim certain property, now standing in her name, and described in the petition as the property of the community, averring that it was purchased with the funds of the community, although placed in Mary Caldwell's name.

This case is one of those episodes which occasionally occur to startle our ideas of the proprieties of life, which involves the actors therein in trouble, and which renders the doing of absolute justice delicate and difficult duties on the part of the judge.

Mary Malady, the plaintiff, was married to William Malady, the defendant, in May, 1834, in Dublin. Almost immediately after their marriage they came to this country. They landed in Massachusetts. Shortly after their arrival she commenced to work for herself, and she continued to do so for several years, her husband, as she alleges, being most of that time away from her. In 1838 he announced to her his intention of going to New Orleans, whither he did go, and finally wrote to her to forget him, as he intended to forget her. Subsequently he married here, and had a child. This wife died, and he then lived with Mary Caldwell, whose interests he had in charge, he having been the administrator of her father's estate. With Mary Caldwell he has been living ever since. In 1861 Mary Malady came to this city; she was weak from sickness and in want. She called upon her husband for assistance. He promised it to her, but required of her that she should live with her brother and sister, whom she has accompanied to St. Louis, San Francisco and Boston. He did furnish her from time to

time with about $270, but these pittances finally ceased. And this amount seems to be everything he has contributed to the support of the woman who followed him across the seas as his wife during all the long years of their marriage. So far as this record discloses she has led an irreproachable life; in her now advancing years she is alone, helpless and destitute.

In the meanwhile, her husband has been guilty of desertion of her, of bigamy, of adulterous connection with a woman who was in some sort his ward, and with whom he has been living in open and bold concubinage.

When Mary Caldwell went to live with Malady, he gave her, rent free, the use of a house on Bacchus street which belonged to him. She then had, according to her own account, some $500 which she had earned as a seamstress. She furnished the house. Malady was in the employ of Priestley & Bein, hardware merchants, doing a large business, where he was receiving $100 per month wages. He had four drays running, which were constantly employed. His contract was to give Mary Caldwell $100 per month board for himself, his four drivers and his child. This was all her source of revenue except what she may have derived from two nephews of his who boarded with her, not all the time, but as a general thing, but who always slept in the house. What board these nephews paid is not shown.

In 1859 she moved to Euterpe street. Malady paid the rent of the house, and continued to give her $100 per month board.

This continued until June, 1862. Then Malady discontinued business. From June, 1862, he paid $40 per month board for himself and daughter until his daughter married. He has paid no board since 1865, because Mary Caldwell says she required some person to see to her business.

On the First of December, 1856, she sold her inheritance for $2800 cash.

As we have seen, when she first went to live with Malady she had $500. Her first purchase of property was made on the eighth of May, 1858, for cash—$1000.

Her second purchase was made on the ninth of January, 1858, for $3800, of which $1266 66⅔ was cash, and the balance in notes which have since been paid.

Her third purchase was made on the twenty-ninth March, 1860, for $1800, $600 cash, balance in two notes of $600 each, which have been paid.

Her fourth purchase was made on the first of June, 1860, for $3250.

Her fifth purchase of property was made on the tenth of May, 1866, $4300 cash.

In little more than two years (eighth of May, 1858, to seventh of

29

June, 1860), she had purchased $9850, on which she had paid $8650, and all of which is now paid for, and within nine years (first January, 1858, to tenth May, 1866), she had purchased and paid for property which cost $14,150. Where did she get this money? From the time she went to live with Malady she had no industry except that of keeping a boarding house. She had no capital save the $500 she commenced with and the $2800 which she received as her patrimony. Taking her own figures as the price she received for board, and allowing her a fair interest on her money, and she would not have received in all, within the time specified, $15,000.

But she says she furnished the house in which they lived. If this be true she could not have had a great deal of her $500 left when she finished. And we must not forget that she only received $100 per month for the board of Malady, his four draymen and his child. For these, as well as for herself and her servant, she was obliged to send to market. This would give her a family of eight persons to provide for every day, besides the wages of her servant and clothes for herself. Add to this the fuel, lights, and the many other things which are indispensable to housekeeping, how much could she have saved out of $100 per month? If she gave her household meat to eat, she would in all probability have found herself at the end of every year in debt.

The only conclusion to which we can come in this matter is that Malady and Mary Caldwell lived together as man and wife, and that her thrift and economy, added to his industry, enabled them to acquire property, which he purchased in her name, for the purpose of placing it beyond the reach of any creditor he might have, and for the further purpose of putting it in such a shape as to prevent his wife from obtaining any of it. This, we think, should not and can not be done.

In the case of Delamour v. Roger, 7 An. 152, it was declared that the circumstance that plaintiff is a concubine of her copartner does not deprive her of an action for the settlement of affairs, and a participation in profits derived by capital and labor which she contributed, though much of the property claimed was real estate standing in the copartner's name aolne, and had never stood in her's. If this is good law in favor of the concubine, it is certainly good law against her, particularly, as is reasoned by the district judge, when it is invoked to undo a fraud, vindicate the rights of a lawful wife, and enforce laws made to protect the marriage tie and public morals.

That Mary Caldwell should be entitled to keep the proceeds arising from the employment of her patrimony and resulting from her industry, we think is unquestionable. She has a right to it all. The fact of the social relations which she has chosen to assume, or of which she may have been the victim, can not deprive her of what justly belongs to her. What, then, is she entitled to? We think she should be

allowed to place her capital and industry against the capital and industry of Malady, and that the property purchased during the time they have been living and working together, should be declared property in which they have a joint interest; that the one-half of it should be decreed to be the property of Malady, and his half thereof be decreed to belong to the community which existed between himself and his wife. We are fortified in this conclusion by the able opinion of our learned brother of the district court, who has given to this case a most careful consideration, and who, we think, has done justice between the parties.

The judgment is affirmed.

———

WYLY, J, *dissenting.* The plaintiff, the wife of the defendant, Malady, sues him for separation from bed and board on the grounds of abandonment and adultery, and she claims half of the community property. She also attacks the titles of the property held by his concubine, Mary Caldwell, on the grounds of fraud and simulation, alleging that her husband is the true owner, and that the titles were put in her name merely to defeat the community rights of the petitioner.

Mary B. Caldwell pleaded the general issue; and William Malady, her co-defendant, besides the general denial, denies that there existed a community of property between him and the plaintiff, because she has never resided with him in Louisiana, but has, for the last thirty-five years, had her residence in Massachusetts; he also denies that he owns any real or personal property to be divided. The court gave judgment for separation from bed and board, ordered a settlement and partition of the community property, and deciding that the property standing in the name of Mary B. Caldwell belongs to a partnership existing between her and her co-defendant, Malady, decreed that one-half thereof belongs to the community, and that Mrs. Malady, the plaintiff, is entitled to one-half of said half, and for the purpose of effecting said settlement and partition referred the parties to a notary with suitable directions.

From this judgment both the defendants have appealed.

In this Court the controversy is confined to the property, the plaintiff's right, to a separation from bed and board not being disputed. Indeed, from the evidence, there is no doubt that the plantiff was shamefully abandoned by her husband some thirty years ago, and that most of the time since then, he has been living in open adultery with Mary B. Caldwell.

I think the court erred in holding that there was a partnership between William Malady and Mary Caldwell, and that the property standing in the name of the latter belongs to that partnership;

because in the record there is neither an allegation nor proof that a contract of partnership existed between these parties. A partnership arises alone from a contract; it can have its origin in no other source known to the law. The court could not, therefore, give a remedy to a contract that never existed. Outside of the property standing in the name of Mary Caldwell, we find that William Malady possessed nothing. Therefore, unless it is shown that he is the real owner of that property, there will be nothing to divide. This the plaintiff has attempted to do; and from a careful examination of the evidence, I am satisfied that the attempt is a failure. It is at best a mere suspicion.

The property was never owned by William Malady; it was acquired from other parties, and it is not shown that he ever advanced a dollar to help to pay for it.

On the other hand, it is shown that Mary Caldwell had $2800, the proceeds of property inherited from her ancestors; that for the last twenty years she has been remarkably industrious and economical, part of the time being occupied as a milliner, but most of the time being engaged in keeping boarders.

William Malady was never wealthy; the most he ever owned was property not worth more than $2000. He was by occupation a drayman, owned several drays, and ought to have made money. Because it is not shown what disposition he made of his earnings and the small property he once possessed, shall we say that the recorded titles of Mary Caldwell shall be treated as simulated; that she shall be held to be merely a party interposed, and that William Malady is really the owner of the property worth $14,000, which she purchased from various persons, and which never belonged to Malady ?

By the jurisprudence of this State all the presumptions of law are in favor of the owner of property. His possession and recorded titles stand to protect him against the claims of all persons setting up an adverse interest, and in order to refute them he is not required to prove how he got the money to buy the property.

If he stole the money, the property bought with it would be his. It devolves on the party alleging simulation and fraud to prove it. It devolves upon the party alleging the interposition of the holder of the legal title, and claiming himself the equitable or actual title, to prove these averments affirmatively. Has the plaintiff in this case done so ?

Not a particle of proof on this important point is to be found in the record. There is no affirmative proof that Mary Caldwell was an interposed party ; there is not a particle of proof to show that William Malady ever paid one dollar for the property of which he is now claimed to be the equitable or actual owner. No fraud or simulation is shown as to Mary Caldwell. There is nothing to impeach the verity of

her or her titles, except, perhaps, she has failed to satisfy the court how she honestly acquired the $14,000 with which to buy the property. This, in my judgment, is no reason to set aside her titles. If she acquired the money as the price of her prostitution, or if she stole it (of which there is not a particle of proof in the record), still her titles in law must stand. I regard the titles of Mary Caldwell as clear and valid as any I have ever seen, and the attempt to assail them is, in my judgment, an utter failure.

If the ownership of property rests upon no better foundation than the ability of the owner to prove, when assailed, where he got the money to pay for it, property rights would be of very little value. Nothing would be more insecure. How and when one makes money to buy property with, can not well be proved, because few persons disclose their transactions to witnesses, and besides, if they do, witnesses die.

If there was a partnership between Mary Caldwell and William Malady, of which there is neither an averment nor proof in this case, I do not see how the plaintiff, the wife of the latter, can claim any specific part of the property. All that could be done would be to sue for a settlement of the partnership. Let the debts be paid, and whatever funds each partner contributed be returned to him or her, and the profits of the partnership be equally divided.

It is proved that Mary Caldwell had $2800, the amount inherited from her parents, and it is proved that she earned $500 as a dressmaker, before she became the concubine of William Malady. Now, in all justice, she ought to have these sums returned before there is a partition of the partnership property. Besides, there is an heir by a putative marriage, who has some rights to William Malady's community rights in the partnership assets. But the judgment decreeing a partnership where none was alleged or proved, and ordering the partition thereof, is, in my opinion, a grave error into which the court has fallen. I therefore dissent in this case.

Rehearing refused.